**FOX ROTHSCHILD LLP**
Formed in the Commonwealth of Pennsylvania
By:     Sarah B. Biser (#024661991)
          Jeffrey M. Pollock (#015751987)
Princeton Pike Corporate Center
997 Lenox Drive
Lawrenceville, NJ 08648
Tel: 646.601.7636 / Fax: 212.692.0940
*Attorneys for Plaintiff*
*The Trustees of Princeton University*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE TRUSTEES OF PRINCETON UNIVERSITY, <br><br> Plaintiff, <br><br> v. <br><br> TOD WILLIAMS BILLIE TSIEN ARCHITECTS, LLP; JACOBS ARCHITECTS/ENGINEERS, INC.; and JACOBS CONSULTANCY INC., <br><br> Defendants. | *Civil Action No. _____* <br><br><br> ***COMPLAINT & DEMAND FOR JURY TRIAL*** <br><br> *(Document Electronically Filed)* |

Plaintiff, The Trustees of Princeton University ("**Princeton**" or "**Plaintiff**"), a private, non-profit educational institution, brings this Complaint against Defendants Tod Williams Billie Tsien Architects, LLP ("**TWBTA**"), Jacobs Architects/Engineers, Inc., and Jacobs Consultancy Inc. (collectively, "**Jacobs**" or the "**Jacobs Entities**") (the three defendants are referred to collectively herein as "**Defendants**"), and states and alleges as follows:

## NATURE OF THE CASE

1.      Defendants are design professionals engaged by, or on behalf of, Princeton to provide professional design services related to the design and construction of The Andlinger Center for Energy and the Environment ("**Andlinger**" or the "**Project**").  Princeton engaged TWBTA to serve as the project architect, and TWBTA, in turn, engaged Jacobs as engineering sub-consultants for the design of the Project as well as other sub-consultants who are not named herein.

2.      Defendants TWBTA and Jacobs (collectively, the "**Design Team**") failed to perform their professional design responsibilities in accordance with the prevailing standard of care, resulting in unnecessary and excessive additional costs and extensive project delays. Further, the Design Team failed to meet the Schedule Milestones set forth in the prime design contract and failed to design to budget as contractually required and, therefore, breached their contracts.  By this action, Princeton seeks to recover the damages it has incurred as a result of Defendants' professional negligence and breach of contract.

## THE PARTIES

3.      Princeton is a non-profit educational institution, existing under the laws of the State of New Jersey, with its principal place of business located at One Nassau Hall, Princeton University, Princeton, New Jersey 08544.

4.      Upon information and belief, TWBTA is a limited liability partnership organized under the laws of the State of New York, with its principal place of business located at 222 Central Park South, New York, New York 10019.  TWBTA provided architectural services related to the Project.

Active\105828599.v1-12/10/19

5.      Upon information and belief, Jacobs Architects/Engineers, Inc. ("**Jacobs Architects/Engineers**") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 777 Main Street, Fort Worth, Texas 76102.  Jacobs Architects/Engineers was a sub-consultant of TWBTA that provided engineering services related to the Project, specifically with respect to scientific laboratory spaces.

6.      Upon information and belief, Jacobs Consultancy Inc. ("**Jacobs Consultancy**") is a corporation organized under the laws of the State of Texas, with its principal place of business located at 5995 Rogerdale Road, Houston, Texas 77072 and an office located at 100 Walnut Avenue, Suite 604, Clark, NJ 07066.  Jacobs Consultancy was a sub-consultant of TWBTA that provided engineering services related to the Project, specifically with respect to scientific laboratory spaces.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332, as there is complete diversity between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8.      The Court has personal jurisdiction over TWBTA because TWBTA has contractually consented to such jurisdiction.  Article XVII (c) of the agreement to perform architectural design services for the Project entered into between Princeton and TWBTA, dated February 12, 2009 (the "**Design Contract**") provides for the exclusive jurisdiction in the State or Federal courts of New Jersey for actions arising under the Design Contract.  Further, this Court has personal jurisdiction over TWBTA because it conducted business in the state and Plaintiff's cause of action relates to and arises out of the business that it conducted in the state, and it has

-3-

availed itself of New Jersey laws by negotiating the Design Contract and performing the design services required as Project architect for the Project.

9.     The Court has personal jurisdiction over Jacobs Architects/Engineers because it has consented to jurisdiction pursuant to Section 8.2 of its agreement with TWBTA, whereby Jacobs Architects/Engineers agreed to participate in whatever dispute resolution process for this matter to which TWBTA is a party or participant.  In addition, the Court has personal jurisdiction over Jacobs Architects/Engineers because it conducted business in the state and Plaintiff's cause of action relates to and arises out of the business that it conducted in the state, and it has availed itself of New Jersey laws by performing engineering services required for the Project.

10.     The Court has personal jurisdiction over Jacobs Consultancy because it has consented to jurisdiction pursuant to Section 8.2 of its agreement with TWBTA, whereby Jacobs Consultancy agreed to participate in whatever dispute resolution process for this matter to which TWBTA is a party or participant.  In addition, the Court has personal jurisdiction over Jacobs Consultancy because it conducted business in the state and Plaintiff's cause of action relates to and arises out of the business that it conducted in the state, and it has availed itself of New Jersey laws by performing engineering services required for the Project.

11.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C. §1391(b)(2).

### ALLEGATIONS COMMON TO ALL COUNTS

12.     In 2008, Princeton issued an RFP for the design and construction of the Andlinger Center for Energy and the Environment, a state-of-the-art, 129,000 square foot facility for research and teaching in the areas of sustainable energy-technology development, energy efficiency, and environmental protection and remediation.  Andlinger would bring together faculty members from various departments and interdisciplinary centers, including Chemical

-4-

Engineering, Electrical Engineering, Civil and Environmental Engineering, Mechanical and Aerospace Engineering, and the Princeton Institute for Science and Technology of Materials, among others, in a world-class facility devoted to research and teaching in the areas of energy and the environment.

13.     On or about February 12, 2009, Princeton engaged TWBTA to perform architectural design services for the Project pursuant to the Design Contract.  A copy of the contract between Princeton and TWBTA for Design Services for the Andlinger Center for Energy & Environment, Contract No. FC0003914W, dated February 12, 2009, is attached hereto as **Exhibit A**.

14.     In order to perform and complete the design services necessary for the Project, TWBTA engaged Jacobs Architects/Engineers and Jacobs Consultancy as well as other sub-consultants.

15.     On or about July 11, 2011, Princeton engaged F.J. Sciame Construction, Inc. ("**Construction Manager**"), to act as construction manager to construct the Project.

16.     Project design commenced in 2009.  Construction commenced in 2012 and was substantially completed on January 1, 2016.

**The Design Contract**

17.     The Design Contract sets forth the terms of the agreement between Princeton and TWBTA, including setting forth the standard of care.

18.     Article VI(a) of the Design Contract, which established the Standard of Care, provides that:

> **Standard of Care**.  Architect-Engineer shall perform the Services hereunder this Agreement in accordance with the standards of skill and care generally exercised by other design professionals in the same locale acting under similar circumstances and conditions.

-5-

19.     Article VI(b) (**Project Administration Services**) of the Design Contract, which sets forth TWBTA's administration obligations, provides that:

> **Project Administration Services**.  The Architect-Engineer shall provide all project administration services necessary to facilitate the orderly progress of the Project, including attending Project meetings, communicating with others as appropriate, monitoring progress and issuing progress reports to Princeton University, supervising Architect-Engineer's in-house personnel, directing Architect-Engineer's Consultants and coordinating and managing information flow and decision-making. (Emphasis supplied).

20.     Article VI(d) (**Project Cost Control**) of the Design Contract provides that:

> (1) **Duty to Design the Project Within the Construction Budget**. Architect-Engineer shall design the Project so that the Construction Cost to construct the Project in accordance with the Construction Documents prepared by the Architect-Engineer and its Consultants does not exceed the Construction Budget. The Architect-Engineer acknowledges that the Construction Budget includes adequate provision for the construction of all elements of the Project designed by or specified by the Architect-Engineer and its Consultants as contemplated by the Project Description attached as Part II of the Contract.

21.     Article VI(f) (**Coordinated Services**) of the Design Contract, which sets forth TWBTA's obligations to coordinate its services and those of its sub-consultants, provides that:

> **Coordinated Services.**  The Architect-Engineer acknowledges that it is essential that all Services in connection with the Project be coordinated, including services provided by Princeton University.  The Architect-Engineer shall coordinate the services of all its architects, engineers, Basic Consultants and Specialized Consultants for the Project, shall review and check all drawings and specifications prepared by architects, engineers, Basic Consultants and Specialized Consultants for the Project, and shall make modifications as necessary, to assure that they are integrated into a coordinated and complete set of documents prior to each submission.  In addition, the Architect-Engineer shall coordinate its Services with services provided by Princeton University and Princeton University's in-house architects.

22.     Article VII(f) (**Construction Documents Phase Services**) of the Design Contract provides, at Article VII(f)(3), that:

**Drawings**. Drawings shall document the scope of work and details for the project, and shall be coordinated both internally, with the Consultants, and with the specifications. Construction Documents shall, in accordance with the Standard of Care set forth in Article VI(a), be in compliance with those codes, ordinances, statutes, regulations and laws applicable to the Architect-Engineer's Services, except to the extent expressly and specifically stated in detail in writing by Architect-Engineer at the time of such submission.

23.     Article VII(h) (**Construction Phase Services – Administration of the Construction Contract**) of the Design Contract, which sets forth the requirements for TWBTA's services during the Construction Phase, provides, among other things, that TWBTA shall:

(i) administer the contract between Princeton and the Contractor in accordance with the Construction Documents;

(ii) respond to requests for information by way of sketches or other supplemental instructions without causing construction delays and within the time agreed to between Contractor and the Architect-Engineer, but shall not result in construction delays; and

(iii) revise the Construction Documents due to, among other things, a reasonable number of Princeton's proposed changes to the Construction Documents.

24.     Article VII(h)(4)(ii) (**Due to Architect-Engineer's Error**) of the Design Contract also provides, in relevant part, that changes to Construction Documents caused by TWBTA's error, omission or failure to coordinate must be made promptly and at no additional cost to Princeton:

[i]f the Construction Documents must be changed to correct Architect-Engineer's error, omission, or failure to coordinate the drawings and specifications comprising the Construction Documents, Architect-Engineer will make the change promptly upon becoming aware of the need for a correction, as part of its Basic Services, and at no additional cost to Princeton University.  Architect-Engineer will work with Princeton University and the Contractor to minimize the impact of the resulting changes on the cost of the Project and the Construction Schedule.

Active\105828599.v1-12/10/19

25.     Article VII(h)(10) (**Submittals**) of the Design Contract provides, in relevant part, that TWBTA shall review all submittals, including shop drawings, product data, and samples, within ten (10) days of receipt of first submissions and subsequent submittals of same, and that the shop drawing review process shall not be used by the Architect-Engineer to enhance or modify the design of the project.  Article VII(h)(10) provides:

> **Submittals.** The Architect-Engineer shall <u>review and/or</u> approve the Contractor's submittals such as shop drawings, product data and samples. The Architect-Engineer's action shall be taken within ten (10) working days of receipt of first submissions and subsequent submittals**,** unless a shorter period is agreed to with respect to particular submittals. Review of such submittals is not conducted for the purpose of determining accuracy and completeness of other details such as dimensions and quantities or for substantiating instructions for installation or performance of equipment or systems by the Contractors, all of which remain the responsibility of the Contractor. The Architect-Engineer's review shall not constitute approval of safety precautions or programs, or of construction means, methods, techniques, sequences or procedures. The Architect-Engineer's approval of a specific item shall not indicate approval of an assembly of which the item is a component. When professional certification of performance characteristics of materials, systems or equipment is required by the Construction Documents, the Architect-Engineer shall be entitled to rely upon such certification to establish that the material, systems or equipment will meet the performance criteria required by the Construction Documents. The shop drawing review process shall not be used by the Architect-Engineer to enhance or modify the design of the project.

26.     Article VII(d), (e), (f), (g), and (h) of the Design Contract further required TWBTA to provide its services in accordance with customary milestones broken down between the design phase, bidding and negotiation phase, and construction phase as follows:

> (i)      During the Schematic Design Phase, TWBTA would submit Schematic Design Documents that included, among other things, preliminary architectural, mechanical, electrical, civil, and landscape designs within the prescribed Construction Budget of $102,290,000.00 for Princeton's review and approval;

> (ii)     During the Design Development Phase, TWBTA would submit Design Development Documents that included, among other things, architectural, mechanical, electrical, civil, and landscape designs that

established the final scope of each discipline for Princeton's review and approval;

(iii)     During the Construction Documents Phase, TWBTA would submit Construction Documents that included, among other things, fully coordinated drawings documenting the scope and detail for the Project;

(iv)     During the Bidding and Negotiation Phase TWBTA would, among other things, assist Princeton in evaluating and awarding bids to contractors to construct the Project; and

(v)     During the Construction Phase, TWBTA would, among other things, review contractor submittals including shop drawings, respond to questions from the contractor concerning the design, prepare further sketches and direction to the contractor, attend project meetings, review the contractor's applications for payment, and regularly visit the site and review the progress and quality of construction, and report back to Princeton.

27.     Article VI(e)(3) (**Consultant Agreements**) of the Design Contract requires TWBTA to include a provision in its subcontracts with consultants, like the Jacobs Entities, expressly designating Princeton as a third-party beneficiary of those subcontracts, stating, in relevant part:

**Consultant Agreements.** Architect-Engineer, shall upon request, provide to Princeton University complete and correct copies of Architect-Engineer's agreement with each Consultant, including amendments thereto. Architect-Engineer shall enter into an agreement with each Consultant pursuant to which the Consultant assumes toward the Architect-Engineer all of the obligations that the Architect-Engineer assumes toward Princeton University under the Contract. In addition, each contract shall include the following provisions:

(i)     An agreement by the Architect-Engineer and Consultant that Princeton University is a third-party beneficiary of the agreement, entitled to enforce any rights thereunder for its benefit, and that Princeton University shall have the same rights and remedies vis-à-vis such Consultants that the Architect-Engineer may have, including, but not limited to, the right to be compensated for any loss, expense or damage of any nature whatsoever incurred by Princeton University, resulting from any breach of such agreements by the Consultant, any breach of representations arising out of such agreements and any negligent

Active\105828599.v1-12/10/19

> error or omission of such Consultant in the performance of any of its professional services obligations under such agreements; . . . .

28.     The Design Contract, at Article XI (**Time of Performance**), also required that TWBTA perform its Services in accordance with the Milestone Design Schedule:

29.     Time is of the essence for this Contract.  The Architect-Engineer shall perform its services under the Contract in accordance with the Milestone Design Schedule set forth below and the Design and Construction Schedule as described in Article VI(c).

| Project Phase | Milestone Dates |
|---|---|
| Schematic Design Phase | December 25, 2009 |
| SD Drawings Complete | October 23, 2009 |
| SD Complete/Approval to Proceed to DD | January 22, 2010 |
| Design Development Phase | October 13, 2010 |
| Construction Documents Phase | September 14, 2011 |
| 50% Documents Complete | February 4, 2011 |
| 85% Documents Complete | June 17, 2011 |
| 100% Documents Complete | September 14, 2011 |
| GMP Agreement | October 7, 2011 |
| Bidding & Negotiation Phase | November 4, 2011 |
| Construction Phase | February 27, 2015 |
| Close-Out Phase | March 2, 2016 |

30.     Finally, the Design Contract calls for TWBTA to indemnify Princeton for TWBTA's negligent acts.  Article XII(h)(1) (**Indemnification**) of the Design Contract states, in relevant part:

-10-

> To the fullest extent permitted by the laws of the State of New Jersey . . .
> the Architect-Engineer (the "Indemnitor" for purposes of interpreting this
> Paragraph) agrees to indemnify and hold harmless, and pay for the defense
> of Princeton University, its trustees, officers and employees, and any
> affiliated or related entities . . . against all claims, loss, liability, damage,
> costs and expenses, including reasonable attorney's fees, that are alleged
> to have occurred in whole or in part arise as a result of, but only to the
> extent caused by and in proportion to, the negligent acts or omissions of
> the Indemnitor, its agents, consultants, employees, or representatives.
> (Emphasis omitted).

### The Design Team's Unsatisfactory Performance

31.     From the outset, TWBTA failed to properly and efficiently coordinate its work with that of its sub-consultants and to manage the work of its sub-consultants.

32.     TWBTA's failure to coordinate its subconsultants and failure to properly manage the design process in a timely manner delayed the completion of the design, and the administration of the construction.  TWBTA's failures plagued the Project, causing Princeton to incur additional costs and suffer project delays.

33.     Further, over the course of the design process, the Design Team repeatedly submitted designs that exceeded the construction budget for the Project.  In fact, the initial design submission exceeded the design to budget by over fifty percent (50%).  The Design Development submission and 50% and 85% construction documents were also over budget.

34.     Submission of grossly over-budget designs required additional rework and extensive value engineering at each design milestone including Schematic Design, Design Development, 50% Construction Documents and 85% Construction Documents to achieve a construction budget that was acceptable to Princeton.

35.     Over the course of the Construction Document Phase, drawings, specifications, and other work product prepared by the Design Team were routinely incomplete and deficient.

### TWBTA Failed to Submit Complete Documents

**In Accordance with Contract Milestones**

36.     Over the course of the Construction Document Phase, TWBTA's drawings, specifications, and other work product were routinely incomplete, deficient and late.

37.     TWBTA failed to meet the following key Contract Milestones:

| % Complete | Contract Milestone |
| --- | --- |
| Schematic Design Phase | December 25, 2009 |
| SD Drawings Complete | October 23, 2009 |
| SD Complete/Approved to Proceed to DD | January 22, 2010 |
| Design Development Phase | October 13, 2010 |
| 85% Documents Complete | June 17, 2011 |
| 100% Documents Complete | September 14, 2011 |
| GMP Agreement | October 7, 2011 |

38.     Instead, TWBTA issued their Construction Documents as follows:

| % Complete | Contract Milestone | Date of Submission |
| --- | --- | --- |
| Design Documents Complete | - | - |
| 85% Documents Complete | June 17, 2011 | August 12, 2011 |
| 100% Documents Complete – First Release | September 14, 2011 | January 13, 2012 |
| 100% Documents Complete – Second Release | September 14, 2011 | June 15, 2012 |
| GMP Agreement | October 7, 2011 | March 12, 2012 |

39.     As set forth above, on August 12, 2011, the Design Team submitted drawings and specifications to Princeton that the Design Team claimed to be 85% complete (and upon which the Construction Manager's guaranteed maximum price ("**GMP**") was to be based).  The Design

Active\105828599.v1-12/10/19

Team's missing details and coordination resulted in the issuance by TWBTA of eleven (11) Bid Addenda and four (4) Construction Addenda before the end of 2011.  As a result, Princeton was forced to require the Construction Manager to delay the buyout of certain key trade subcontractors to provide more time for the Design Team to complete its work.

40.     After the submission on August 12, 2011, TWBTA issued the following bid addenda:

|   |   |   |
|---|---|---|
| a. | Bid Addenda 1–3 | 9/27/11 |
| b. | Bid Addenda 5–8 | 9/30/11 |
| c. | Bid Addenda 4 | 10/6/11 |
| d. | Bid Addenda 9 | 10/31/11 |
| e. | Bid Addenda 10 | 11/7/11 |
| f. | Bid Addenda 11 | 12/2/11 |

41.     Prior to construction TWBTA issued the following construction addenda:

|   |   |   |
|---|---|---|
| a. | Construction Addendum 1 | 9/26/11 |
| b. | Construction Addendum 2 | 9/27/11 |
| c. | Construction Addendum 3 | 10/12/11 |
| d. | Construction Addendum 4 | 9/26/11 |

42.     Like the 85% set, the 100% Construction Documents package that TWBTA issued on January 13, 2012 **were not complete**.  The drawings were missing details and coordination.  Thus, after this package was issued, TWBTA issued more construction addenda:

|   |   |   |
|---|---|---|
| a. | Construction Addendum 6 & 7 | 2/14/12 |
| b. | Construction Addendum 8 | 2/17/12 |
| c. | Construction Addendum 12 & 13 | 3/01/12 |

-13-

43.     Princeton could not finalize the GMP with the Construction Manager until March 12, 2012 – five months after the scheduled milestone.  Construction commenced on or about February 27, 2012.

44.     The 100% Construction Documents were still not complete.  TWBTA issued the following construction addenda after the GMP was executed:

      a.      Construction Addendum 9      3/14/12

      b.      Construction Addendum 14      3/23/12

      c.      Construction Addendum 10      4/20/12

      d.      Construction Addendum 5      5/01/12

      e.      Construction Addendum 11      5/03/12

      f.      Construction Addendum 16      5/22/12

      g.      Construction Addendum 15      6/01/12

45.     Princeton's numerous admonitions to TWBTA to complete the drawings properly were not heeded.  TWBTA issued a final consolidated drawing set that included these addenda on June 15, 2012 (the "**Consolidated Set**"), which was also labeled as the 100% Construction Documents.  The Design Team issued one last construction addendum four months after the Consolidated Set was issued – Construction Addendum 8 – on October 10, 2012.

46.     Yet, the revised set of 100% Construction Documents was still incomplete -- resulting in significant rework and redesign by the Design Team on an on-going basis during the Construction Phase of the Project.

47.     Contrary to the express provisions of the Design Contract, TWBTA and the Design Team often used trade subcontractor shop drawings, in particular, mechanical trades' shop drawings, as an opportunity to revise the design and finish incomplete or incorrect designs contained in the construction drawings.

-14-

**The Design Team Issued 87 ASIs That Required Revisions
to More Than a Thousand Drawings**

48.     The failure of TWBTA and the Jacobs Entities to properly, timely, and fully complete the project design resulted in the Design Team's issuance of scores of Architect's Supplemental Information notices (each an "**ASI**") to the Construction Manager.  In fact, the Design Team used ASIs and Addendum - over the one-year time period subsequent to the submission of 85% Construction Documents - to complete the design work, including coordination among the subconsultant disciplines.

49.     After the so-called 100% Construction Documents were issued, TWBTA issued approximately eighty-seven (87) ASIs from June 15, 2012 until June 21, 2017.  These ASIs fundamentally revised and modified the 100% set of Construction Documents, and contained revisions that captured missing or incorrect details and missing design coordination required for the construction of the Project.  Moreover, seven (7) of the ASIs were revised and resubmitted with even more design revisions.

**TWBTA's Incomplete and Deficient Work
Resulted in No Less than 462 Change Orders**

50.     The impact of the cascade of ASIs and other design changes was extensive.  The ASIs and the Design Team's other incomplete or deficient work resulted in the issuance of no less than four hundred and sixty-two (462) out of the Project's six hundred and fifty-four (654) Change Order Requests ("**CORs**") to the Construction Manager.

51.     Of the four hundred and sixty-two (462) design related CORs**,** four hundred and thirty-eight (438) CORs are related to TWBTA's and/or Jacobs' errors and omissions; seventeen (17) CORs are related to additional Building Information Modeling ("**BIM**") services as a result of design revisions; and seven (7) CORs are related to delays that the Design Team caused.

52.     Thus, Princeton has been damaged in an amount no less than $3,400,000 (the "**Errors and Omissions Costs**") resulting from the four hundred and thirty-eight (438) CORs related to the Design Team's errors and omissions.  The Design Team is responsible for these Errors and Omissions Costs, which would not have been incurred had the Design Team delivered a set of fully detailed and complete coordinated drawings from the outset of the Project.

### Additional BIM Services & Costs

53.     The Design Contract required that TWBTA deliver a full model of the Project using Building Information Modeling ("**BIM**").  The Design Contract specifically provides, in relevant part, in Part II, Project Description (at page 4 - 5):

> **Building Information Modeling**
>
> The selected Architect will implement a design and documentation process that is fully coordinated with all consultants. It is highly desired that the Architect will utilize three-dimensional, real-time, dynamic building modeling software to increase productivity in building design and construction. The process is to produce a Building Information Model (BIM), which encompasses building geometry, spatial relationships, geographic information, and quantities and properties of the building components. It is anticipated that the Architect will work with Princeton University at the earliest inception of the project to establish an acceptable BIM standard for the project.

54.     The original BIM coordination that the Construction Manager and its subcontractors carried out required extensive revisions by the Construction Manager and mechanical subcontractors because of the incomplete drawings and volume of revisions received from the Design Team.

55.     The ASIs that TWBTA issued after issuance of the Consolidated Set resulted in seven (7) change order requests to Princeton by the Construction Manager for revisions required to the BIM Construction Model.  These changes order were as follows:

(i)     CO 44                    MMC Contractors            $   4,521

| | | | |
|---|---|---|---|
| (ii) | CO 171A R1 | Barham Group | $ 523,224 |
| (iii) | CO 171B R1 | MMC Contractors | $ 263,639 |
| (iv) | CO 171C A | Unity International Group | $ 212,077 |
| (v) | CO 171C BR1 | Unity International Group | $ 196,203 |
| (vi) | CO 233B | Sciame | $ 156,606 |
| (vii) | CO 249 R1 | Majek | $   7,681 |
| | Total: | | $1,363,951 |

56.     Thus, the ASIs, which fundamentally changed elements of the design over an extended period of time, resulted in design errors and omissions and required the Construction Manager and its subcontractors to extensively and repeatedly rework previously completed portions of the BIM model.  As a result, Princeton was required to pay the Construction Manager an additional $1,363,951 for additional BIM services, which were evidenced by seven (7) CORs (the "**Additional BIM Costs**").

57.     These additional BIM services would not have been necessary if the Design Team delivered a complete set of coordinated drawings from the outset of the Project.  Thus, the Design Team is responsible for the Additional BIM Costs.

**The Design Team Delayed the Project by No Less than Five Months**

58.     TWBTA's failure to provide complete and coordinated documents to the construction manager on June 15, 2012, TWBTA's failure to coordinate the work of the Design Team and the excessive number of Design Team related changes and ASIs resulted in excessive costs and delays to the construction of the Project.

59.     One extreme example of the delays caused by the design team includes ASI 36, which impacted the execution of the project as follows: On or about December 3, 2013, TWBTA issued ASI 36, which proposed modifications to the clean room space of the Project—a highly

specialized laboratory space equipped with a state-of-the-art air filtration system that filters airborne dust 1,000-fold for specialized nanotechnology research, such as the creation of plastic-based solar cells and superconducting materials.

60.     Jacobs, the specialty laboratory sub-consultants, had previously selected and incorporated galvanized steel for the clean room exhaust duct material in the drawings issued for construction.  However, on or about October 11, 2013, while construction was ongoing, Jacobs wrote to Princeton recommending a change to the duct material from galvanized steel to PTFE-lined stainless steel ductwork.

61.     On Jacobs' recommendation, TWBTA prepared and issued ASI 36 in December 2013, which provided for the change in material from galvanized to PTFE-lined stainless steel. Nevertheless, throughout January 2014, Princeton and Construction Manager urged Jacobs to further evaluate and consider whether the change to PTFE-lined ductwork was necessary.

62.     As a result of indecision by TWBTA and the Design Team concerning the duct material, Princeton engaged an independent laboratory consultant (the "**Independent Consultant**") to review the proposed PTFE-lined duct material.  The Independent Consultant ultimately recommended a change from the original galvanized steel ductwork to stainless steel ductwork, but rejected the PTFE-lined duct that the Design Team proposed.

63.     ASI 36, Revision 1, which TWBTA issued on or about February 1, 2014, memorialized the ultimate change from galvanized steel to stainless steel.  Later, on or about March 21, 2014, ASI 36, Revision 2 changed the stainless steel ductwork from welded to bolted connections.

Active\105828599.v1-12/10/19

64.     The Design Team's months-long delay in finalizing the duct material change in ASI 36 was further compounded by more incomplete drawings that were missing, among other things, final tool connections and exhaust duct drops in the clean room, exacerbating the delays.

65.     As a result of the Design Team's final ductwork changes in ASI 36 and incomplete drawings, the Construction Manager and subcontractors' coordination of the BIM model and issuance of the shop drawings was delayed.

66.     Thereafter, after months of additional shop drawing review and revisions by the Design Team, the final shop drawings related to the ductwork were completed, approved, and released for fabrication in August 2014.  This process of BIM coordination, shop drawings and fabrication delayed the installation of exhaust ductwork in the cleanroom by at least 3.5 months.

**Delays**

67.     The Project was substantially completed on January 1, 2016, approximately ten months behind schedule.  Total delays attributable to Design Team are no less than five (5) months.

68.     As a result of the Design Team-caused delays, including but not limited to ASI 36, Princeton incurred more than $6,000,000 in damages (the "**Delay Damages**").

<u>**COUNT ONE**</u>
**(Breach of Contract Against TWBTA)**

69.     Princeton incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as though set forth at length herein.

70.     TWBTA materially breached the Design Contract by failing to perform its services in accordance with the terms of the Design Contract.  Specifically, TWBTA materially breached the Design Contract by, among other things:

-19-

    a.   failing to adequately prepare plans and specifications for the construction of the Project so as to prevent the numerous errors, omissions, delays, and other defects that developed on the Project;

    b.   failing to adequately manage, supervise, and oversee the design services, including the preparation of the plans and specifications by its consultants, including but not limited to, Jacobs, so as to prevent the numerous errors, omissions, delays, and other defects that developed on the Project; and

    c.   in other respects to be proved at trial.

71.    Princeton has fulfilled all of its contractual obligations and any and all conditions precedent to asserting these claims against TWBTA.

72.    As a direct and proximate result of TWBTA's defective performance and breach of the Design Contract, Princeton has incurred significant expense related to the numerous errors, omissions, delays, and other defects that developed on the Project, including but not limited to the Errors and Omissions Costs, Additional BIM Costs, and Delay Damages, as well as other direct damages in an aggregate amount of not less than $10,700,000.

**WHEREFORE**, Princeton demands judgment against TWBTA on this Count for compensatory and monetary damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest at the highest rate permitted by applicable New Jersey law, and such other and further relief as the Court deems just and proper.

## COUNT TWO
### (Negligence Against TWBTA)

73.    Princeton incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as though set forth at length herein.

74.    In performing consultative services related to the Project, TWBTA provided architectural advice upon which Princeton reasonably relied, and over which Princeton exercised no direct control.

-20-

75.     In performing its consultative services for the Project, TWBTA owed Princeton a reasonable duty of care to perform its architectural services in accordance with the reasonable standard of care expected of similarly situated professionals performing such work on comparable projects.

76.     TWBTA materially breached its duty of care to Princeton by, among other things:

(a)     failing to adequately prepare plans and specifications for the construction of the Project so as to prevent the numerous errors, omissions, delays, and other defects developed on the Project;

(b)     failing to adequately manage, supervise, and oversee the services, including the preparation of the plans and specifications by its consultants, including but not limited to, Jacobs, so as to prevent the numerous errors, omissions, delays, and other defects that developed on the Project; and

(c)     in other respects to be proved at trial.

77.     As a direct and proximate result of TWBTA's material breach of duty to Princeton, Princeton has incurred significant expense related to the numerous errors, omissions, delays, and other defects that developed on the Project, including but not limited to the Errors and Omissions Costs, Additional BIM Costs, and Delay Damages, as well as other direct damages, in an aggregate amount of not less than $10,700,000.

**WHEREFORE**, Princeton demands judgment against TWBTA on this Count for compensatory and monetary damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest at the highest rate permitted by applicable New Jersey law, and such other and further relief as the Court deems just and proper.

## COUNT THREE
### (Declaratory Judgment – Indemnification Against TWBTA)

78.     Princeton incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as though set forth at length herein.

79.     Princeton is entitled to a declaration under <u>N.J.S.A.</u> 2A:16-50, <u>et</u> <u>seq.</u>, of the rights, duties, and responsibilities of the parties under the Design Contract.

80.     An actual and justiciable dispute exists between the parties for which Princeton lacks an adequate remedy at law and is entitled to a declaration of rights from the Court.

81.     The Design Contract requires TWBTA to indemnify Princeton for all "loss[es], liability, damages, cost and expenses" incurred by Princeton as a result of the negligent acts or omissions of TWBTA and/or the Jacobs Entities.

82.     As a result of TWBTA's negligence, Princeton has incurred damages and costs related to design errors and omissions, including but not limited to the Errors and Omissions Costs, Additional BIM Costs, and Delay Damages.

**WHEREFORE**, Princeton demands judgment against TWBTA on this Count, declaring that TWBTA must indemnify and hold harmless, and pay for the defense of, Princeton for all claims, loss, liability, damage, costs and expenses, including reasonable attorney's fees, that are alleged to have occurred in whole or in part arise as a result of, but only to the extent caused by and in proportion to, the negligent acts or omissions of TWBTA and/or the Jacobs Entities.

## <u>COUNT FOUR</u>

**(Third Party Beneficiary Breach of Contract Against the Jacobs Entities)**

83.     Princeton incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as though set forth at length herein.

84.     Princeton was an intended and foreseeable beneficiary of the contracts under which TWBTA retained both Jacobs Entities to evaluate technical considerations related to the design and construction of the Project.

85.     The Jacobs Entities materially breached their contracts with TWBTA by failing to adequately consult on and evaluate technical considerations related to the design and

-22-

construction of the Project and to coordinate their services with those of TWBTA so as to prevent the numerous errors, omissions, delays and other defects that developed on the Project, and in other respects to be proved at trial.

86.     Princeton has fulfilled its contractual obligations to TWBTA and/or either of the Jacobs Entities, if any, and all conditions precedent to asserting these claims against TWBTA and the Jacobs Entities with this Court.

87.     As a direct and proximate result of the Jacobs Entities' material breach of their contracts with TWBTA, Princeton has been damaged in an amount to be determined at trial in that it has incurred significant expense related to the numerous errors, omissions, delays, and other defects that developed on the Project, including but not limited to the Errors and Omissions Costs, Additional BIM Costs, Delay Damages, as well as other direct damages and consequential losses.

**WHEREFORE**, Plaintiff demands judgment against the Jacobs Entities on this Count for compensatory and monetary damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest at the highest rate permitted by applicable New Jersey law, and such other and further relief as the Court deems just and proper.

**COUNT FIVE**
**(Negligence Against the Jacobs Entities)**

88.     Princeton incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as though set forth at length herein.

89.     In performing consultative services related to the Project, the Jacobs Entities provided technical engineering services upon which Princeton reasonably relied, and over which Princeton exercised no direct control.

90.     In performing their consultative services for the Project, the Jacobs Entities owed

-23-

Princeton a reasonable duty of care to perform their technical engineering and/or architectural work in accordance with the reasonable standard of care expected of similarly situated professionals performing such work on comparable projects.

91.     The Jacobs Entities materially breached their duty of care to Princeton by failing to adequately consult on and evaluate technical considerations related to the design and construction of the Project and to coordinate their services with those of TWBTA so as to prevent the numerous errors, omissions, delays, and other defects that developed on the Project, and in other respects to be proved at trial.

92.     As a direct and proximate result of the Jacobs Entities' material breach of duty to Princeton, Princeton has been damaged in an amount to be determined at trial in that it has incurred significant expense related to the numerous errors, omissions, delays, and other defects that developed on the Project, including but not limited to the Errors and Omissions Costs, Additional BIM Costs, Delay Damages, as well as other direct damages and consequential losses.

**WHEREFORE**, Plaintiff demands judgment against the Jacobs Entities on this Count for compensatory and monetary damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest at the highest rate permitted by applicable New Jersey law, and such other and further relief as the Court deems just and proper.

**FOX ROTHSCHILD LLP**
*Attorneys for Plaintiff*
*The Trustees of Princeton University*

Dated: December 10, 2019          By: _____

Sarah B. Biser, Esq.
Jeffrey M. Pollock, Esq.

-24-

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues so triable in the present matter.

**FOX ROTHSCHILD LLP**
*Attorneys for Plaintiff*
*The Trustees of Princeton University*

Dated: December 10, 2019        By: _____

Sarah B. Biser, Esq.
Jeffrey M. Pollock, Esq.

## DESIGNATION OF TRIAL COUNSEL

Sarah B. Biser, Esq., is designated as trial counsel on behalf of Plaintiff, The Trustees of Princeton University.

**FOX ROTHSCHILD LLP**
*Attorneys for Plaintiff*
*The Trustees of Princeton University*

Dated: December 10, 2019        By: _____

Sarah B. Biser, Esq.
Jeffrey M. Pollock, Esq.

Active\105828599.v1-12/10/19